IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ANGELA AYRES, *et al.*,                              *

      Plaintiffs,                              *

          v.                              *          CIVIL NO.: WDQ-13-1597

OCWEN LOAN SERVICING, LLC,                              *
*et al.*,                              *

      Defendants.                              *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Angela Ayres and Stephan Ayres sued Ocwen Loan Servicing, LLC ("Ocwen") and Salomon Brothers Mortgage Securities VII ("Salomon Brothers").  Pending are Ocwen's motion to dismiss, Angela Ayres's motion for summary judgment,[1] and Salomon Brothers motion to quash service of process and to dismiss.  No hearing is necessary.  *See* Local Rule 105.6 (2014).  For the following reasons, Salomon Brothers' motion will be granted, Ocwen's motion to dismiss will be granted in part and denied in part, Mrs. Ayres motion will be denied, and Ocwen's motion for limited discovery will be denied as moot.

---

[1] The motion for summary judgment was asserted only on behalf of Mrs. Ayres and not the Plaintiffs jointly.

I.   Background[2]

On March 18, 1991, the Plaintiffs bought a property at 6600 Halleck Street, District Heights, Maryland ("the Property") with a loan of $72,660 from Market Street Mortgage secured by a Deed of Trust ("the Ayres Note").   *See* ECF No. 61 (hereinafter, "Am. Compl.") at ¶ 20.   The Plaintiffs allege that "Mr. Ayres was and remains the <u>only</u> obligor/borrower on the Ayres Note [and] Mrs. Ayres has never agreed to assume any liability on the Ayres Note."   *Id.* (emphasis in original).   "The Ayres Note set the interest rate at 9.5% . . . and had a maturity date in April 2021.   The fixed monthly principal and interest payment on the Ayres Note equaled $610.96 and payments were due on the first day of the month and would not be subject to a late fee if paid by a grace period of 15 days of each month."   *Id.* at ¶ 21.

On August 25, 1993, Mr. Ayres filed for bankruptcy under Chapter 13 of the Bankruptcy Code.[3]   Am. Compl. at ¶ 22.   Under

---

[2] Because the Court will be addressing motions to dismiss and a motion for summary judgment, which have different standards, the facts in the Background section will be from the amended complaint.   Additional facts from beyond the complaint will be provided before the summary judgment analysis.

On a motion to dismiss, the well-pled allegations in the complaint are accepted as true.   *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).   The Court will consider the pleadings, matters of public record, and documents attached to the motions that are integral to the complaint and whose authenticity is not disputed.   *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

his Chapter 13 reorganization plan, Mr. Ayres "made all required payments with his then mortgage servicer related to the Ayres Note—i.e. First Union Mortgage Corp. ("First Union")—and the Chapter 13 Trustee also paid to First Union Mortgage Corp. the total of $4,731.91" *Id.* at ¶ 24.  In June 1996, Stephan Ayres completed the bankruptcy plan, and the bankruptcy case was discharged.  *Id.* ¶ 23, 26.

"Despite the fact that Mr. Ayres was current on the Ayres Note following the successful completion of his Chapter 13 Bankruptcy and discharge, the mortgage servicer for the Ayres Note, First Union, demanded sums not contractually due and owing on the Ayres Note."  Am. Compl. at ¶ 27.  In May 1998, First Union returned a mortgage payment stating that the Plaintiffs owed $13,972.  *Id.*  "Mr. Ayres attempted to get First Union to accept his continued payments from May 1998 and thereafter but it refused to accept the payments and continued to demand sums that were not contractually due."  *Id.* at ¶ 28.

"[A] few months after failing to get First Union to correct its false records," Mr. Ayres requested that the U.S. Department of Housing and Urban Development ("HUD") "take over the Ayres Note and assign the Ayres Note to another servicer."  Am. Compl.

---

[3] "Mrs. Ayres was not a party to Mr. Ayres' bankruptcy case *In re Ayres*, Case No. 93-14732 (U.S. Bankruptcy Court for the District of Maryland).  Nor has she ever sought bankruptcy protection in her own regard whatsoever."  Am. Compl. at ¶ 25.

at ¶ 29.  "[T]he Ayres Note was accepted into HUD's assignment program on November 9, 1998 and soon thereafter assigned to a new servicer Clayton National Inc. ("Clayton") who acted on behalf of HUD with respect to the loan."[4]  *Id.*

In December 2000, the loan was assigned from HUD to Salomon Brothers Realty Corp. and transferred to Litton Loan Servicing for servicing. Am. Compl. at ¶ 34, 36.  "Litton began shortly thereafter claiming that Mrs. Ayres was a borrower on the Ayres Note when at no time did she agree to be obligated on the Ayres Note."  *Id.* at ¶ 39.  "Mr. Ayres had given Litton . . . permission to discuss his mortgage account with Mrs. Ayres but that consent was never an agreement for her to have become obligated on the Ayres Note."  *Id.*  "On August 17, 2001, Lela Derouen, Assistant Vice President of Litton . . . affirmed before a Notary Public from the State of Texas named Elizabeth H. Willard in a 'Lost Note Affidavit' that 'STEPHAN AYRES' was the only borrower on the Ayres Note . . . ."  *Id.* at ¶ 35.

---

[4] The Plaintiffs allege that "when the Ayres Notes was transferred to HUD, it incorrectly assumed the original balance on the Ayres Note was also the then current balance thereby not giving Mr. Ayres any credit for the more than $16,000 in payments that occurred prior to the servicing transfer to HUD which had included small portions towards the principal balance of the loan.  In addition, First Union reported to Mr. Ayres before the transfer from it to Clayton that the principal balance was substantially and materially less than the original loan balance even though it was not giving credits for payments received."  Am. Compl. at ¶ 32.

"As of September 13, 2002, Litton reported that Mr. & Mrs. Ayres owed no delinquent sums of money on the Ayres Note. Litton intended for Mr. & Mrs. Ayres to rely upon this statement." Am. Compl. at ¶ 40. On May 15, 2003, however, Litton claimed that the Plaintiffs owed "in addition to the regular mortgage payment the sum of $23,383.28 for 'OTHER FEES DUE.'" Id. at ¶ 41. "Mrs. Ayres proceeded, on her husband's behalf and with his authority, to communicate with Litton over and over for several years, in writing and orally, regarding the basis of Litton's claim in May 2003 . . . that $23,383.28 in additional 'OTHER FEES' was owed on the Ayres Note." Id. at ¶ 42.

Litton did not provide documentation explaining the "other fees." Am. Compl. at ¶ 43. Instead, on November 26, 2001, Litton informed the Plaintiffs "an Arrearage Bond of $23,280.02 was added to the loan" because of the Plaintiff's previous participation in HUD's Fresh Start Program. Id. "Litton never provided Mr. & Mrs. Ayres with any audit or other information supporting its claim that an 'Arrearage Bond' was authorized, consented to, and added to the Ayres Note. Litton only provided an incomprehensible and false accounting of the Ayres Note from the time it commenced servicing the loan." Id. at ¶ 44. The Plaintiffs continued to request documentation. Id. at ¶ 45. On

5

September 7, 2007, Litton "modified" its explanation of the Arrearage Bond, explaining that "the sums it claimed were due were made in consideration of Mr. & Mrs. Ayres for various loan modifications which simply worked to capitalize the disputed sums claimed due and extend the term of the Ayres Note beyond the initial 30 year period." *Id*. at ¶ 46. "In addition, Litton attempted to add Mrs. Ayres by these proposed offers as an additional obligor on the Ayres Note when it knew she was not a co-borrower." *Id*.

In June 2009, the Plaintiffs defaulted on the loan. Am. Compl. at ¶ 47. "However, by approximately January 2010 the payments were caught up and were current again." *Id*. In April 2010 Litton reevaluated the Ayres Note; however, "it utilized the [] false financial records . . . and as a result . . . the 'owner of the [Ayres Note] did not approve a modification.'" *Id*. at ¶ 48. Further, on June 23, 2011, Litton claimed that the Plaintiffs "had not timely returned certain financial information to it as part of its consideration of various loan modification applications." *Id*. at ¶ 49. The Plaintiffs allege that they "had timely returned all required documents and Litton kept asking for the same documents over and over but Litton would only claim it did not receive the requested documents." *Id*.

6

In November 2011, Litton transferred the servicing of the loan to Ocwen.  Am. Compl. ¶ 53.  On December 6, 2011, Ocwen sent the Plaintiffs a letter stating that "mortgage payments are past due, which puts you in default on your loan agreement." Id.[5]  On numerous dates from November 2011 to May 2012, "Ocwen sent statements to Mr. & Mrs. Ayres which it intended them to rely upon and[,] in which[,] [Ocwen] demanded false sums due on the Ayres Note . . . and also falsely claimed that Mrs. Ayres owed it certain sums . . . ."  Id. at ¶ 55.

In January 2012, the Plaintiffs filed a complaint with the Maryland Division of Financial Regulations.  Am. Compl. at ¶ 56. On March 15, 2012, the Plaintiffs sent Ocwen a Qualified Written Request ("QWR").  Id. at ¶ 58.  Other than sending a "basic acknowledgment of receipt" to the Plaintiffs, Ocwen provided "no substantive information" in response to the QWR.  Id.

On April 6, 2012, Ocwen informed the Maryland Commissioner of Financial Regulation that Mrs. Ayres was a borrower on the Ayres Note, "admitted that it and Litton had demanded false sums

---

[5] The Plaintiffs allege that "Ocwen knew or should have known that Mrs. Ayres was not in default or an obligor on the Ayres Note."  Am. Compl. at ¶ 53.  "However, it never actually reviewed the Ayres Note before making this false claim and simply adopted without any investigation the false and misleading records of Litton and presumed based upon those records that the account related to the Ayres Note included invalid sums related to sums not contractually due and owing." Id.

due related to the escrow for property taxes," "represented that the payments made by the Ayres were applied to the account in a sequence contrary to the Ayres Note and associated Deed of Trust," and "adopted the false accounting and prior false statements of its predecessors." Am. Compl. at ¶ 59. Despite these representations, on April 10, 2012, Ocwen sent the plaintiffs a statement asserting that the Plaintiffs "would need to pay a monthly escrow payment of $262.37 for their annual taxes . . . ." Id. at ¶ 60. The Plaintiffs' prior attorney sent several letters identifying misapplied payments and overcharges. ECF No. 1 ¶¶ 61, 65, 66, 68.[6] Ocwen did not correct the account or respond. Id.

In July 2012, Ocwen provided the following facts to the Maryland Commissioner of Financial Regulation: Mrs. Ayres was a borrower on the Ayres Note, Mrs. Ayres had filed for Chapter 13 Bankuptcy along with Mr. Ayres, the loan "may have become current as of June 26, 1996," and "Ocwen had assessed an incorrect sum due for the escrow account related to the Ayres Note and demanded sums not validly due for property taxes." Am. Compl. at ¶¶ 62-63. On July 31, 2012, Ocwen sent the Plaintiffs a Notice of Default. Id. at ¶ 64. On September 28, 2012,

---

[6] Ocwen responded to one QWR on February 4, 2013. Am. Compl. at ¶ 70. The response, however, "did not respond to many of the details identified in the QWR inquiries then pending and simply ignored the facts presented by Mr. & Mrs. Ayres." Id.

"Ocwen attempted to induce Mr. & Mrs. Ayres to enter into a loan modification of the Ayres Note which would have obligated Mrs. Ayres on the Ayres Note and included the disputed sums it had previously admitted to Mr. & Mrs. Ayres that it could not directly prove were due." *Id.* at ¶ 67.  On October 3, 2014, the Plaintiffs discovered that Ocwen "was falsely reporting a trade line to Equifax related to Mrs. Ayres[,] claiming that she was a borrower/debtor on the Ayres Note and that she was allegedly past due . . . ."[7] *Id.* at ¶ 72.

On June 6, 2013, the Plaintiffs *pro se*[8] sued the Defendants for claims related to mortgage fraud.  ECF No. 1.  On August 27, 2014, the Court granted the Defendants' motion to dismiss.  ECF Nos. 55-56.  However, "[b]ecause the Plaintiffs are representing themselves, and they have apparently asserted their claims in good faith," the dismissal was without prejudice, and the Court granted the Plaintiffs "an opportunity to amend their complaint *in accordance with this Memorandum Opinion.*"[9]  ECF No. 55 at 24

---

[7] The Plaintiffs also assert that they suffered additional damages, including "out of pocket costs, healthcare costs related to the emotional distress[,] . . . legal fees," and damage to their reputations  Am. Compl. at ¶¶ 75-78.

[8] Plaintiffs are now represented by counsel. Counsel entered his appearance on October 24, 2014.  ECF No. 60.

[9] The Order accompanying the Memorandum Opinion did not address the leave to amend. *See* ECF No. 56.  However, the Order

(emphasis added).  The Court warned the Plaintiffs "that if they do not clearly and adequately state their claims, they will be dismissed with prejudice." *Id.*

On October 24, 2014, the Plaintiffs filed an amended complaint.  ECF No. 61.  In addition to providing additional facts as requested in the August 27, 2014 Opinion, the Amended Complaint included claims that were not present in the original complaint.[10]  On December 19, 2014, Ocwen moved to dismiss the

---

incorporated the Memorandum Opinion.  *See id.* ("For reasons discussed in the accompanying Memorandum Opinion . . . .").

[10] Construing the original complaint liberally because of the Plaintiffs' *pro se* status, the Court concluded that the original complaint attempted to assert 15 claims: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of the covenant of good faith and fair dealing; (4) fraud; (5) negligence; (6) usury; (7) unjust enrichment; (8) willful misfeasance; (9) violation of the Truth-in-Lending Act ("TILA"); (10) violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"); (11) violation of the Fair Debt and Collection Practices Act ("FDCPA"); (12) violation of the Maryland Mortgage Fraud Presentation Act ("MFPA"); (13) violation of the Maryland Consumer Protection Act ("MCPA"); (14) rescission; and (15) emotional distress.  *See* ECF No. 1 at 8-20; ECF No. 32 at 1.

The Amended Complaint asserts eight claims: Violation of the MCPA and the Maryland Consumer Debt Collection Act ("MCDCA") (Count I); violation of the MFPA (Count II); negligence (Count III); violation of the Real Estate Settlement Procedures Act ("RESPA") (Count IV); tortious interference with economic relationship (Count V); declaratory and injunctive relief (Count VI); defamation (Count VII); and violation of the FDCPA (Count VIII).  ECF No. 61 at 28-46.

amended complaint.  ECF No. 66.[11]  On January 20, 2015, Mrs. Ayres moved for summary judgment on "whether [or] not Mrs. Ayres ever agreed to be legally obligated to a mortgage note executed by Plaintiff Stephan Ayres on or about January 17, 1991 . . . ."[12]  ECF No. 70-1 at 1.  On February 20, 2015, Salomon Brothers moved to quash service of process and to dismiss.[13]  ECF No. 78. On March 26, 2015, Ocwen moved for limited discovery on whether Mrs. Ayres was obligated under the Note.[14]  ECF No. 85.

II.  Analysis

    A.  Salomon Brothers' Motion to Quash Service of Process and to Dismiss

       1. Legal Standard

Under Fed. R. Civ. P. 12(b)(5), a defendant may move to dismiss for insufficient service of process.  When service is contested, "the plaintiff bears the burden of establishing the validity of service" under Fed. R. Civ. P. 4.  *O'Meara v. Waters*, 464 F. Supp. 2d 474, 476 (D. Md. 2006).  When service of process gives the defendant "actual notice" of the action, Rule

---

[11] On January 20, 2015, the Plaintiffs opposed the motion.  ECF No. 69.  On February 9, 2015, Ocwen replied.  ECF No. 77.

[12] On February 6, 2015, Ocwen opposed the motion.  ECF No. 74. On February 24, 2015, Mrs. Ayres replied.  ECF No. 81.

[13] On March 9, 2015, the Plaintiffs opposed the motion.  ECF No. 82.  On March 25, 2015, Salomon Brothers replied.  ECF No. 84.

[14] On April 13, 2015, the Plaintiffs opposed the motion.  ECF No. 86.  On April 28, 2015, Ocwen replied.  ECF No. 88.

4 may be liberally construed.  *O'Meara*, 464 F. Supp. 2d at 476;

*see also Karlsson v. Rabinowitz*, 318 F.2d 666, 668 (4th Cir.

1963).  But "the rules are there to be followed, and plain

requirements for the means of effecting service of process may

not be ignored."  *Armco, Inc. v. Penrod-Stauffer Bldg. Sys.,*

*Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984).

    2. The Motion to Quash

    Salomon Brothers is a trust registered with the SEC.[15]  See

ECF No. 78-1 at 1.  On November 6, 2014, counsel for the Trustee

emailed the Plaintiffs explaining that the Plaintiffs had

---

[15]

> As of the date hereof, Salomon Brothers Mortgage
> Securities VII, Inc. (the "Registrant") has caused to
> be filed with the Securities and Exchange Commission
> (the "Commission") pursuant to the Commission's Rule
> 424 a Prospectus Supplement to its Prospectus, dated
> August 23, 2001, in connection with the Registrant's
> issuance of a series of certificates, entitled
> Mortgage Pass-Through Certificates, Series 2001-2 (the
> "Certificates"), to be issued pursuant to a pooling
> and servicing agreement, dated as of November 1,
> 2001,among the Registrant as depositor, Litton Loan
> Servicing LP as servicer, JPMorgan Chase Bank as
> trustee and Citibank, N.A. as trust administrator. The
> Certificates designated as the Series 2001-2
> Certificates will represent in the aggregate the
> entire beneficial ownership interest in a trust fund
> (the "Trust Fund") consisting primarily of a
> segregated pool (the "Mortgage Pool") of conventional,
> one- to four-family, first and second lien fixed-rate
> and adjustable-rate mortgage loans having original
> terms to maturity up to 30 years (the "Mortgage
> Loans").

http://www.sec.gov/Archives/edgar/data/809877/000088237701500483
/d17812.txt (last visited Aug. 13, 2015).

incorrectly sued the Trust rather than the Trustee.  ECF No. 78-
2 at 1.  Trustee's counsel offered to consent to an amended
complaint if the Plaintiffs would sue the Trustee rather than
the Trust, and agreed to accept service on the Trustee's behalf
if an amended complaint was filed.  *Id.*  Instead of amending the
complaint, the Plaintiffs attempted to serve the Trust through
the Maryland State Department of Assessments and Taxations.  ECF
No. 75.

Under Federal Rule of Civil Procedure 4(e)(1), an entity
"within a judicial district of the United States" may be "served
in a judicial district of the United States by following state
law for serving a summons in an action brought in courts of
general jurisdiction in the state where the district court is
located or where service is made . . . ."  Here, the Plaintiffs
attempted to serve Salomon Brothers in accordance with Maryland
Rule 2-124(o) which states:

> Service may be made upon a corporation, limited
> partnership, limited liability partnership, limited
> liability company, or other entity *required by statute
> of this State to have a resident agent* by serving two
> copies of the summons, complaint, and all other papers
> filed with it, together with the requisite fee, upon
> the State Department of Assessments and Taxation if
> (i) the entity has no resident agent; (ii) the
> resident agent is dead or is no longer at the address
> for service of process maintained with the State
> Department of Assessments and Taxation; or (iii) two

13

good faith attempts on separate days to serve the
resident agent have failed.

(emphasis added).

Salomon Brothers asserts that service was insufficient
because it is not required to have a registered agent in
Maryland.  ECF No. 78-1 at 2-3.  The Plaintiffs argue that
Salomon Brothers "has put forward no evidence that it does not
need to have a resident agent in Maryland."  ECF No. 82 at 1.
However, it is the Plaintiffs' burden to establish that service
is proper, not Salomon Brothers.  *See O'Meara*, 464 F. Supp. 2d
at 476.

Although Maryland does not have a statute explaining when a
trust must have a registered agent, it does have statutes which
delineate when a corporation does business in Maryland, thereby
requiring a registered agent.  Under Maryland Code, Corporations
and Associations, § 7-104, a corporation does not "do[]
intrastate, interstate, or foreign business in [Maryland]" if it
"foreclos[es] mortgages and deeds of trust on property in this
State; as a result of default under a mortgage or deed of trust,
acquir[es] title to property in this State by foreclosure, deed
in lieu of foreclosure, or otherwise; hold[s], protect[s],
rent[s], maintain[s], and operat[es] property in this State so
acquired; and sell[s] or transfer[s] the title to property in
this State so acquired to any person . . . .

14

The only "action" taken by Salomon Brothers in Maryland according to the Amended Complaint was being the owner of the Ayres Note. *See* ECF No. 82 at 1 (service was proper because Salomon Brothers "is admittedly the owner of the loan at issue in this case."). If such action was undertaken by a corporation, it would not constitute "doing business" in Maryland under § 7-104. The Plaintiffs have offered no argument or authority showing why a trust should be held to a different standard. Because the trust was not doing business in Maryland and was not required to have a registered agent under Maryland law, service under Maryland Rule 2-124(o) was improper.

Moreover, although Salomon Brothers had actual notice, quashing service and allowing the Plaintiffs to re-serve the Trust would be inappropriate in this case because the Trust is not a valid party. Under Federal Rule of Civil Procedure 17(b)(3), "whether a trust has the capacity to be sued in this Court is determined by the law of the state of Maryland." *Bowman v. Finance Am., LLC*, No. AW-13-208, 2013 WL 4495824, at *3 (D. Md. Aug. 19 2013). Under Maryland law, "a trust as an entity does not have the capacity to be sued and that . . . capacity exists only in its trustees." *White v. Lundeberg Md. Seamanship Sch., Inc.*, 57 F.R.D. 128, 130 (D. Md. 1972); *see also Allegis Grp., Inc. Contractors Health Plan Trust v. Conn.*

*Gen. Life Ins. Co.*, No. JFM-04-16, 2004 WL 1289862, at *2-4 (D.
Md. June 10, 2004); *Limouze v. M.M. & P. Mar. Advancement,
Training, Educ. Program*, 397 F.Supp. 784, 789 (D. Md.1975).  The
Court "discerns no reason to depart from the well-settled
Maryland rule in the circumstances of this case."[16]  *Bowman v*,
2013 WL 4495824, at *3.  Accordingly, Salomon Brothers' motion
will be granted.

    B.    Ocwen's Motions to Dismiss

        1. Legal Standard

    Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed
for failure to state a claim upon which relief can be granted.
Rule 12(b)(6) tests the legal sufficiency of a complaint, but
does not "resolve contests surrounding the facts, the merits of
a claim, or the applicability of defenses."  *Presley v. City of
Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

    The Court bears in mind that Rule 8(a)(2) requires only a
"short and plain statement of the claim showing that the pleader
is entitled to relief."  *Migdal v. Rowe Price-Fleming Int'l
Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's

---

[16] In *White*, the district court permitted the plaintiffs to sue a
trust because "the composite totality of [the] factual
background" established that the trust had conducted substantial
business in the state under its trade name, misled others as to
its status as a trust, and billed entities under its corporate
name.  *See White v*, 57 F.R.D. at 130.  The Plaintiffs have not
provided such facts in this case.

notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id*. at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. (internal quotation marks and alteration omitted).

If a plaintiff alleges a claim sounding in fraud, Rule 9(b) requires that "the circumstances constituting fraud be stated with particularity." The rule "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *Kerby v.*

17

*Mortg. Funding Corp.*, 992 F. Supp. 787, 799 (D. Md. 1998).   To satisfy the rule, a plaintiff must "identify with some precision the date, place, and time of active misrepresentations or the circumstances of active concealments, specifying which Defendant . . . is supposedly responsible for those statements or omissions." *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007).   The Court "should hesitate to dismiss a complaint under Rule 9(b) if [it] is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

      2. Judicial Estoppel

    Ocwen assert that the Plaintiffs should be judicially estopped from arguing that Mrs. Ayres was not obligated under the Ayres Note because of the Plaintiffs' representations in the original complaint. *See* ECF No. 77 at 7.   The Plaintiffs assert that when they were *pro se*, they assumed that Ocwen's alleged representations that Mrs. Ayres was obligated under the Note were true; after obtaining counsel, this belief changed. *See* ECF No. 69 at 13.

"Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Zinkand v. Brown*, 478 F.3d 634, 639 (4th Cir. 2000).  Judicial estoppel has three elements.  "First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation."[17]  *Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir. 1996).  "Second, the prior inconsistent position must have been accepted by the court."  *Id.*  Finally, the party must have acted in bad faith, "intentionally misled[ing] the court to gain unfair advantage."  *Tenneco Chems., Inc. v. William T. Burnett & Co.,* 691 F.2d 658, 665 (4th Cir. 1982).  "Without bad faith, there can be no judicial estoppel."  *Zinkand*, 478 F.3d at 639.  Judicial estoppel is an equitable doctrine within the Court's discretion.

In the original complaint, the Plaintiffs' alleged that Mrs. Ayres was a borrower under the Ayres Note with her husband. *See, e.g.*, ECF No. 1 at ¶ 18.  In contrast, the amended complaint alleges that Mrs. Ayres was never a borrower under the Note; in fact, this new fact is the basis for the Plaintiffs' defamation claim.  *See, e.g.*, Am. Compl. at ¶¶ 132-34.  Further,

---

[17] "The position at issue must be one of fact as opposed to one of law or legal theory."  *Zinkand*, 478 F.3d at 639.

the Court accepted the allegations in the original complaint as true and relied on the Plaintiffs' assertions in ruling on the previous motion to dismiss.  *See* ECF No. 55 at 3-4.  Therefore, the first two elements of judicial estoppel have been established.

Bad faith would exist in this case, if the Plaintiffs knew or believed that Mrs. Ayres was not obligated under the Note at the time they filed the original complaint, and changed their position in filing the amended complaint in order to state claims that the Court had previously dismissed or establish new claims.[18]  Based solely on the facts alleged in the amended complaint, the Court cannot determine when the Plaintiffs came to believe that Mrs. Ayres was not obligated under the note. Therefore, the Court cannot now conclude that the Plaintiffs acted in bad faith.  Accordingly, the Court will not judicially estop the Plaintiffs from asserting that Mrs. Ayres was not bound under the Ayres Note.

### 3. New Claims in the Amended Complaint

---

[18] The party against whom judicial estoppel is asserted must have acted "intentionally;" thus, it differs from the statute of limitations which is determined by what the party knew or should have reasonably investigated.  *See infra* Part II.B.3.

In dismissing the original complaint, the Court granted leave to amend "in accordance with [the] Memorandum Opinion." ECF No. 55 at 24.  The Court also gave the Plaintiffs permission to add a claim for injunctive relief.[19]  When the Plaintiffs amended their complaint, however, they added three additional claims--defamation, tortious interference with economic relationship, and violation of RESPA--without seeking leave of the Court or the Defendants' consent.[20]  Ocwen asserts that these claims should be dismissed because they "violate[] the Court's Order."  ECF No. 66 at 9.

Although the Court intended to grant only *limited* leave to amend, the language in the Memorandum Opinion was somewhat unclear.  *See* ECF No. 55 at 25 ("As the claims in the complaint will be dismissed without prejudice, the Plaintiffs may amend their complaint to include a claim for injunctive relief.").  Further the Court's Order merely stated that the claims in the original complaint were dismissed without prejudice and did not address the leave to amend.  *See* ECF No. 56.  Leave to amend should be freely given when justice requires.  Fed. R. Civ. P. 15(a)(2).  Accordingly, the Court will grant the Plaintiffs

---

[19] *See* ECF No. 55 at 25 ("[T]he Plaintiffs may amend their complaint to include a claim for injunctive relief.").

[20] Rule 15(a)(2) permits amendments only with the opposing party's written consent or leave of the court.

leave to amend *nunc pro tunc* as long as the three new claims do
not "unduly prejudice the opposing party, amount to futility, or
reward the movant's bad faith."   *Steinburg v. Chesterfield Cnty.*
*Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008); *Equal Rights*
*Ctr. v. Niles Bolton Associates*, 602 F.3d 597, 603 (4th Cir.
2010).

> a.   Violation of the Real Estate Settlement
>      Procedures Act

The Plaintiffs allege that Ocwen violated the Real Estate
Settlement Procedures Act ("RESPA")[21] by failing to respond to
the Qualified Written Requests ("QWRs") that the Plaintiffs sent
to Ocwen identifying errors on their account.   Am. Compl. at 35-
36.   Ocwen argues that the RESPA claim is futile because the
Plaintiffs did not send correspondence that qualified as QWRs
under the statute, and, thus, Ocwen had no obligation to
respond.   ECF No. 66 at 14-15.

RESPA was enacted "to insure that consumers . . . are
provided with greater and more timely information on the nature
and costs of the settlement process and are protected from
unnecessarily high settlement charges caused by certain abusive
practices . . . . ."   12 U.S.C. § 2601.   Therefore, RESPA
requires a mortgage servicer to acknowledge receipt of a
borrower's QWR within 5 days and respond within 30 days.   *See* 12

---

[21] 12 U.S.C. §§ 2601 *et seq.*

U.S.C. § 2605(e)(1)-(2) (2011).  Specifically, within 30 days
after receipt of a QWR, a servicer must conduct an investigation
and "provide the borrower with a written explanation or
clarification" that includes either: (1) "a statement of the
reasons for which the servicer believes the account of the
borrower is correct as determined by the servicer[,] and the
name and telephone number of an individual employed by, or the
office or department of, the servicer who can provide assistance
to the borrower;" or (2) "information requested by the borrower
or an explanation of why the information requested is
unavailable or cannot be obtained by the servicer[,] and the
name and telephone number of an individual employed by, or the
office or department of, the servicer who can provide assistance
to the borrower."  *Id.* § 2605(e)(2).  If a servicer fails to
comply, the borrower is entitled to recover actual damages, as
well as statutory damages in cases of "a pattern or practice of
noncompliance."  *Id.* § 2605(f).

RESPA defines a QWR as "a written correspondence, other
than notice on a payment coupon or other payment medium supplied
by the servicer, that (i) includes, or otherwise enables the
servicer to identify, the name and account of the borrower; and
(ii) includes a statement of the reasons for the belief of the
borrower, to the extent applicable, that the account is in error

23

or provides sufficient detail to the servicer regarding other information sought by the borrower."   12 U.S.C. § 2601(e)(1)(B). A "servicer" is "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)."   *Id.* § 2605(i)(2).   "Servicing" is "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."   *Id.* § 2605(i)(3).

The Plaintiffs allege that they sent Ocwen four QWRs.[22] Ocwen argues that the Plaintiffs letters did not qualify as QWRs

---

[22] On March 15, 2012, the Plaintiffs through prior counsel sent a letter to Ocwen about the arrearage bond assessed to the account.   Am. Compl. at ¶ 58.   On May 24, 2012, the Plaintiffs sent another correspondence which questioned "an incorrect escrow sum demanded by Ocwen and the fact that Ocwen was claiming past due invalid sums when in fact the Ayres Note was current.   This inquiry also asked Ocwen to explain why it had not responded to the March 15, 2012 inquiry."   Id. at ¶ 61.

On August 28, 2012, the Plaintiffs sent another inquiry, "address[ing] Ocwen and Litton's continued overcharges to their escrow account; the proper posting of nearly $18,113 in payments made by Mr. Ayres subsequent to his bankruptcy discharge that he was not given credit for by First Union; and HUD's improper identification of the original loan balance on the Ayres Note as the sum due when it acquired the Ayres Note.   In support of these facts, prior counsel provided Ocwen with detailed account and other records and documentation to support Mr. & Mrs. Ayres position and contentions."   Am. Compl. at ¶ 66.   On January 8,

because they attacked the validity of the loan and do not relate to the servicing of the loan (i.e. receipt and application of payments). ECF No. 66 at 14-15.

Courts have held that allegations and requests for documents that relate to the validity of the loan and do not attack the servicing of the loan are not QWRs under RESPA. *See Ward v. Sec. Atl. Mortg. Elec. Registration Sys., Inc.*, 858 F. Supp. 2d 561, 574-75 (E.D.N.C. 2012) ("There are no allegations in the amended complaint regarding irregularities in BAC's servicing of the loan and the notice does not identify purported errors with Plaintiffs' account or ask questions relating to BAC's servicing thereof. . . . Accordingly, Plaintiffs' March 2010 notice did not qualify as a valid QWR and thus BAC's failure to respond thereto does not subject BAC to RESPA liability.").[23]

In this case, the alleged QWRs were not attached to the amended complaint. *See Ward*, 858 F. Supp. 2d at 574-75

---

2013, the Plaintiffs sent another request which "included a copy of the prior request made on August 28, 2012 and requested that Ocwen respond to the inquiry." *Id.* at ¶ 68.

[23] *See also Junod v. Dream House Mortg. Co.*, No. CV 11-7035-ODW, 2012 U.S. Dist. LEXIS 3865, at *11-*12, 2012 WL 94355, at *3-*4 (C.D. Cal. Jan. 5, 2012) (copies of the promissory note and deed of trust and "a complete life of loan transactional history" are "not the type of information RESPA contemplates"); *DeVary v. Countrywide Home Loans, Inc.*, 701 F. Supp. 2d 1096, 1108 (D. Minn. 2010) (requests about the financing of the original loan were not covered by RESPA).

("Plaintiffs include as an exhibit to the amended complaint a document entitled 'Qualified Written Request' . . . ."). The Plaintiffs allege, however, that the letters to Ocwen questioned the validity of current charges and past payments not credited to the account. *See* Am. Compl. at ¶¶ 58, 61, 66, 68. Without examining the documents themselves, the Court cannot determine, as a matter of law, that the requests made by the Plaintiffs were only related to the validity of the loan and not Ocwen's servicing. The Plaintiffs' allegations are sufficient to establish that their communications were QWRs under the Rule 8 pleading standards.

Ocwen also asserts that the RESPA claim is futile because the Plaintiffs have not pled proper damages. ECF No. 66 at 15. Under the RESPA claim in the amended complaint, the Plaintiffs assert that Mr. Ayres suffered actual damages of $75,000 from Ocwen's RESPA violations, and Mrs. Ayres suffered $150,000. Am. Compl. at ¶ 115. The Plaintiffs do not identify how these damages flowed directly from Ocwen's failure to respond to the QWRs. *See id.* Such conclusionary allegations are insufficient to establish actual damages under RESPA.[24]  *See Offiah v. Bank of*

---

[24] Elsewhere in the amended complaint, the Plaintiffs allege that they incurred healthcare costs, emotional and physical injury, and attorney's fees based on Ocwen's actions. Am. Compl. at ¶ 75-77. These, however, are not direct economic damages

*Am.*, No. DKC 13-2261, 2014 WL 4285020, at *3-4 (D. Md. Aug. 29, 2014); *Willis v. Bank of Am. Corp.*, ELH-13-02615, 2014 WL 3829520, at *31 (D. Md. Aug. 1, 2014) (conclusionary assertion that actual damages arose from the failure to adequately respond to a letter was not sufficient to establish actual damages); *Radisi v. HSBC Bank USA*, No. 5:11 CV 125-RLV, 2012 WL 2155052, at *5 (W.D.N.C. June 13, 2012) ("Plaintiff's assertion of damages without any supporting facts as to how he was damaged by the failure to respond to the QWR's is insufficient to establish a claim for violation of RESPA.").

RESPA, however, also permits plaintiffs to claim statutory damages if a defendant has "a pattern or practice of noncompliance."  12 U.S.C. § 2605(f).  Here, the Plaintiffs have alleged that Ocwen continuously failed to respond to their QWRs, and that Ocwen has engaged in similar conduct in the past.  *See* Am. Compl. at ¶ 115.  These facts are sufficient to allege statutory damages under RESPA.  *See Galante v. Ocwen Loan Serving, LLC*, ELH-13-1939, 2014 WL 3616354, at *34 (D. Md. July 18, 2014) (plaintiffs failed to allege statutory damages under RESPA because they only detailed one QWR).

Because the Plaintiffs have sufficiently stated a claim under RESPA, the amendment is not futile.  Accordingly, the

---

cognizable under RESPA.  *See Offiah*, 2014 WL 4285020, at *3-4; *Willis*, 2014 WL 3829520, at *30-32.

Court will grant leave to amend the complaint *nunc pro tunc* to add the RESPA claim.

> b.   Tortious Interference with Economic
> Relationship

The Plaintiffs allege that Ocwen tortiously interfered in a contract between the Plaintiffs and Salomon Brothers by claiming an arrearage bond on the Plaintiffs' account, representing that Mrs. Ayres was an obligor, and charging sums not due. *See* Am. Compl. at ¶¶ 117-19.

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 116 (Md. 1994). The tort has "two general manifestations." *Id.* at 117. The first manifestation is often described as "inducing the breach of an existing contract," and the second, "more broadly," constitutes "maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell v. Littlepage,* 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (citation and quotations omitted). Maryland Courts have explained that the second "interference" manifestation is appropriate when there is no existing contract or the contract is terminable at will, and the defendant uses "wrongful means" to interfere. *Macklin v. Robert Logan Assocs.*, 639 A.2d at 121; *see also Webb v. Green Tree Servicing*, No. ELH 11-2105, 2014 WL 6141464, at

*4-5 (D. Md. Dec. 9, 2011).  "[W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships.  Wrongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994) (quoting *K & K Management v. Lee*, 557 A.2d 965, 979 (Md. 1989)).

Here, although the Plaintiffs assert that the Court should apply the elements for the second manifestation of tortious interference,[25] there is an existing contract which is not terminable at will.  Accordingly, the Court will apply the elements of the "inducing breach" manifestation.[26]

To state a claim for tortious interference with a contract, a plaintiff must allege "(1) existence of a contract between

---

[25] *See* ECF No. 69 at 24.

[26] "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted." *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984).  "A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved."  *Id.* at 674.

plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Ct. Spec. App. 1991). Intent can be proven "by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the expense of the plaintiff." *Macklin*, 639 A.2d at 119.

Ocwen argues that the tortious interference claim is futile because there were not three parties involved. ECF No 66 at 16. It is a "well-established Maryland rule that, for the tort of wrongful interference with economic relations to lie, the defendant tortfeasor cannot be a party to the economic relationship with which the defendant has allegedly interfered." *Kaser v. Fin. Protection Marketing, Inc.*, 831 A.2d 49, 60 (Md. 2003). Therefore, tortious interference has a "three-party requirement." *Id.* at 58.

Contrary to Ocwen's argument, the Plaintiffs have alleged a three-party relationship. The Plaintiffs allege a contract between Mr. Ayres and Salomon Brothers (i.e., the Ayres Note) with which Ocwen interfered by fraudulently servicing the loan and purposefully attempting to push the Plaintiffs into default.

30

*See* Am. Compl. at ¶¶ 117-20.  This is a sufficient three-party relationship to state a claim for tortious interference.  *See Nash v. Green Tree Servicing, LLC*, 943 F. Supp. 2d 640, 647-48 (E.D. Va. 2013) (tortious interference suit alleging that servicer interfered with contract between lender and borrower under similar Virginia law).

However, the Plaintiffs did not allege that Salomon Brothers breached the contract in response to Ocwen's interference.  Therefore, the Plaintiffs have failed to allege a claim for tortious interference, and the proposed amendment is futile.  *See Fowler,* 598 A.2d at 802.  Accordingly, the Court will not grant leave to amend, and Count V shall be stricken from the amended complaint because it was included without leave of the Court or consent of Ocwen.

c.  Defamation

The final new claim added by the Plaintiffs is for defamation.  The Plaintiffs allege that "[o]n or about December 1, 2011 and thereafter, including throughout the last 12 months before the filing of this Amended Complaint, Ocwen made a series of false and misleading statements to Mr. & Mrs. Ayres, the credit reporting agencies, and others including Salomon Brothers that Mrs. Ayres was past due on the Ayres Note or was otherwise delinquent or in default." Am. Compl. at ¶ 132.  Further, "Ocwen

wrote and published these claims in correspondence and in written communications with various agencies who it knew would utilize the information."   *Id.* at ¶ 133.

"In order to plead properly a defamation claim under Maryland law, a plaintiff must allege specific facts establishing four elements to the satisfaction of the fact-finder: '(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'"   *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012) (quoting *Indep. Newspapers, Inc. v. Brodie,* 966 A.2d 432, 448 (Md. 2009)).

The Plaintiffs conclusionarily state that Ocwen made defamatory statements in the 12 months before the filing of the Amended Complaint.[27]   However, "[e]very alleged defamatory statement constitutes 'a separate instance of defamation,' which 'a plaintiff must specifically allege.'"   *See Gainsburg v. Steben & Co.*, 838 F. Supp. 2d 339, 344 (D. Md. 2011) (quoting *English Boiler & Tube Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d

---

[27] Am. Compl. at ¶ 132.

862 (table), 1999 WL 89125, at *3 (4th Cir.1999)). Accordingly, these general allegations are not actionable.[28]

Under Maryland law, the limitations period for a defamation action is one year. Md. Code Ann., Cts. & Jud. Proc. § 5-105; *Gainsburg v. Steben & Co.*, 838 F.Supp.2d 339, 344 (D. Md. 2011). "Although, ordinarily, the limitations period runs from the time that the defamatory statement is published, Maryland law follows the discovery rule, which provides that a cause of action accrues at the time the plaintiff 'knows or reasonably should know of the wrong.'" *Id.* (quoting *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F.Supp.2d 460, 464 (D. Md. 2008)).

The amended complaint was filed on October 24, 2014. The last actions taken by Ocwen that were allegedly defamatory were the statements Ivonne Humphreys made to the Maryland Commissioner on July 10, 2012, and the Ocwen's statements to credit reporting agencies which the Plaintiffs discovered on

---

[28] It appears that the Plaintiffs made their conclusionary allegation in order to rescue their prior claims from the statute of limitations. However, a plaintiff "may not baldly allege a broad course of conduct over a lengthy period of time and later sue on any act that occurred during that time period . . . ." *Gainsburg v. Steben & Co.*, 838 F.Supp.2d 339, 344 (D. Md. 2011) (citation and quotation omitted).

October 3, 2014.[29]  Based on these factual allegations, all the
defamatory statements except the statement made to Equifax are
barred by the statute of limitations.[30]

The Plaintiffs argue that the prior statements "relate
back" to the original complaint, and, therefore, are not barred
by the statute of limitations.  ECF No. 69 at 28.

Under Federal Rule of Civil Procedure 15(c) an amendment to
a pleading "relates back to the date of the original pleading
when . . . the amendment asserts a claim or defense that arose
out of the conduct, transaction, or occurrence set out—or
attempted to be set out—in the original pleading."  "The purpose

---

[29] The amended complaint does not state when Ocwen made the
statements or when the Plaintiffs discovered the credit reports.
*See* Am. Compl. at ¶ 72 ("Upon information and belief,  Ocwen
has  also pulled or  acquired Mrs. Ayres' credit when it knew
she was not a mortgage servicer and it had no right to do so.
This belief is based upon the fact as of October 3, 2014 Ocwen
was falsely reporting a trade line to Equifax related to Mrs.
Ayres claiming that she was a borrower/debtor on the Ayres
Note and that she was allegedly past due when it actually knows
she is not a borrower.").  However, on a motion to dismiss, the
Court must grant all reasonable inferences to the Plaintiffs.
Accordingly, for the purpose of this motion, the Court will
assume that the Plaintiffs discovered Ocwen's reports to the
credit agency on October 3, 2014.  "[T]he truth of plaintiff's
representations[] or impeach[ing] [the] plaintiff's diligence in
uncovering publication . . . are not matters for a motion to
dismiss."  *Adler v. Am. Stand. Corp.*, 538 F. Supp. 572, 576 (D.
Md. 1982).

[30] Ocwen also argues that any statement made about Mrs. Ayres was
true and, therefore, not defamatory.  ECF No. 66 at 18-19.
Ocwen's argument, however, depends on documents outside the
amended complaint and is, therefore, inappropriate on a motion
to dismiss.

of Rule 15(c) is to provide the opportunity for a claim to be tried on its merits, rather than being dismissed on procedural technicalities, when the policy behind the statute of limitations has been addressed." *Tischler v. Baltimore Bancorp*, 801 F. Supp. 1493, 1497 (D. Md. 1992). There are two requirements for a claim to "relate back" to an earlier pleading: there must be a "factual nexus between the amendment and the original complaint," and (2) the defendant must have "notice of the claim" and must "not be prejudiced by the amendment." *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983); *see also Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 630 (D. Md. 2011).

Here, even if the amended complaint and original complaint contained a factual nexus, Ocwen had no notice until the filing of the amended complaint that the Plaintiffs would assert that Mrs. Ayres was not a borrower under the Ayres Note and that any of the statements made by Ocwen to the contrary were defamation. *See Bruce v. Smith*, 581 F. Supp. 902, 905-06 (W.D. Va. 1984). Despite the Plaintiffs' assertions to the contrary,[31] this is not a case in which the plaintiff pursues a new legal *theory* in the amended complaint, or adds additional facts in support of a

---

[31] *See, e.g.*, ECF No. 69 at 13 (arguing that the Plaintiffs are only trying to advance a new legal theory based on prior core facts).

prior theory.  In the original complaint, the Plaintiffs represented that Mrs. Ayres was a borrower under the Ayres Note. Here, the Plaintiffs are alleging new facts and basing their allegations on those facts.  There was simply no notice to Ocwen within the limitations period that the Plaintiffs would be adopting this new stance.  Thus, the defamation claim does not relate back to the original complaint.[32]

Thus, to the extent that the defamation claim attempts to allege liability for statements made prior to October 24, 2013, those allegations are futile under the statute of limitations.[33] The Court cannot conclude based solely on the amended complaint that Ocwen's statement to Equifax is barred by the statute of limitations; accordingly, the Court will grant leave to amend

---

[32] *See Gainsburg,* 838 F.Supp.2d at 343-44 (allegations that the defendant defamed the plaintiff by referring to him as an extortionist did not relate back to the original complaint which focused on the conditions and termination of the plaintiff's employment and only "included one count of defamation to the effect that [the defendant] falsely stated that [the plaintiff] had made professional errors, even though [the defendant] knew that [the plaintiff] was not responsible for the subject materials.")

[33] The Plaintiffs filed the original complaint *pro se* and may not have known the legal consequence of Ocwen's representations about Mrs. Ayres.  "Knowledge of facts, . . . not knowledge of their legal significance, starts the statute of limitations running." *Miller v. Pac. Shore Funding,* 224 F.Supp.2d 977, 986-87 (D. Md. 2002.)  Although the Court notes that the Plaintiffs were previously represented by counsel when sending Ocwen QWRs questioning their payments and obligations, and argue throughout the complaint that Mrs. Ayres's status as a non-obligor could be determined by a simple review of the records.

the complaint *nunc pro tunc* to include solely that defamation claim.

      4. Count I: MCPA and MCDCA Violations

    The Maryland Consumer Protection Act prohibits "unfair or deceptive trade practices." *See* Md. Code Ann., Com. Law § 13-301. Section 13-408 of the MCPA provides a private cause of action. *See* Md. Code Ann., Com. Law § 13-408. A private party bringing a claim under § 13-408 of the MCPA must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Steward v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012). The injury must be "objectively identifiable . . . [i]n other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance" on the misrepresentation. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 143 (Md. 2007).

    The Plaintiffs allege that Ocwen violated the MCPA by demanding sums not due, asserting that Mrs. Ayres was obligated under the loan, and assessing improper fees. *See Am. Compl.* at ¶¶ 85-86. Because these allegations sound in fraud, Rule 9(b)'s heightened pleading standards apply. *See Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 (D. Md. 2009). The Court dismissed the Plaintiffs' original MCPA because the Plaintiffs failed to plead

damages.  ECF No. 55 at 21-22.  Ocwen argues that the amended
complaint has not corrected the deficiency.[34]  ECF No. 66 at 11.

The Plaintiffs allege emotional and physical damages
resulting from Ocwen's actions.  *See* Am. Compl. at ¶ 78.
Physical symptoms of mental anguish can support a MCPA claim.
*See Green v. Wells Fargo Bank*, 927 F. Supp. 2d 244, 256 (D. Md.
2013) (mental anguish can be sufficient to establish MCPA
liability); *Allen v. CitiMortgage,* No. CCB-10-2740, 2011 WL
3425665, at *9 (D. Md. Aug. 4, 2011) (the plaintiffs alleged
sufficient damages under MCPA included "emotional damages").
However, if the mental anguish arose from the plaintiff's
decisions before the loan servicer's actions, and the servicer
does not "specifically direct[] them to do, or to refrain from
doing, anything that adversely affected the state of affairs
that existed prior to the alleged misrepresentations," the
mental anguish does not satisfy the MCPA's damage requirement.[35]

---

[34] Ocwen also argues that Mrs. Ayres is a borrower under the
loan, negating any MCPA claim.  ECF No. 66 at 11.  Ocwen's
argument depends on a document which was attached to the
original complaint.  An amended complaint, however, supersedes
the original complaint.  *Pac. Bell Tel. Co. v. Linkline
Commc'ns, Inc.,* 555 U.S. 438, 456 (2009).  Therefore, the Court
cannot consider Ocwen's argument and evidence on a motion to
dismiss.

[35] *See Green*, 927 F. Supp. 2d at 256 (finding plaintiffs' mental
anguish relating to the foreclosure on their home insufficient
to support MCPA liability because plaintiffs caused the default
on the loan, and the servicer made no promise of a permanent

38

Here, the Plaintiffs allege that they were not in default, and, but-for Ocwen's fraudulent actions, they would not have experienced the mental, physical, and emotional damages alleged. *See, e.g.*, Am. Compl. at ¶¶ 4-5. These allegations are sufficient to survive a motion to dismiss.

In Count I, the Plaintiffs also allege that Ocwen violated the MCDCA by knowingly, "claim[ing] certain sums (i.e. invalid debts) due from Mrs. Ayres that it knew were not in fact due and owing."[36]  Am. Compl. ¶ 92.  Ocwen argues that the MCDCA claim should be dismissed because the "Plaintiffs had to allege that . . . Ocwen used 'threatening or underhanded methods in collecting or attempting to collect a debt.'"  ECF No. 66 at 12 (quoting *Stovall v. Suntrust Mortg., Inc.*, RDB-10-2836, 2011 WL 4402680, at *9 (D. Md. Sept. 20, 2011).

Ocwen attempts to add an element to the MCDCA claim which does not exist.  In the section of *Stovall* quoted by Ocwen, the court was discussing the MCDCA's general purpose, it was not discussing the elements of a prima facie case.  *See* 2011 WL 4402680, at *9.  The court went on to explain that the MCDCA

---

loan modification, only that it would begin the modification process).

[36] Notably, the Plaintiffs only assert MCDCA violations for Ocwen's attempts to collect from Mrs. Ayres, not for their attempts to collect from the Plaintiffs, when the Plaintiffs allege that they were not in default. *See* Am. Compl. at ¶¶ 91-93.

provides that debt collectors may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8); *see also Stovall*, 2011 WL 4402680, at *9. Although using threats and force are also prohibited acts under § 14-202 of the MCDCA, they are not the only acts. Here, the Plaintiffs have alleged that Ocwen knowingly tried to enforce a right that it did not have, which is sufficient to state a claim. *See Fontell v. Hassett*, 891 F. Supp. 2d 739, 742 (D. Md. 2012) ("Specifically, the MCDCA provides that debt collectors may not '[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist.' Md. Code Ann., Com. Law § 14-202(8). Accordingly, if Hassett and Gatling collected or attempted to collect Plaintiff's debt with knowledge that they were not licensed as collection agencies, they are liable for damages under the MCDCA.").

Finally, Ocwen argues that the Plaintiffs' claims under Count I violate the statute of limitations and must be dismissed. ECF No. 66 at 19-21. Specifically, Ocwen asserts that "[a] close reading of [the] Plaintiffs' claims demonstrates that they are premised on purportedly false statements made more than three-years prior to the time the Plaintiffs filed their Complaint." *Id.*

40

Claims under the MCPA and MCDCA are subject to a three-year statute of limitations.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-501; *see also Boardley v. Household Fin. Corp.*, 39 F. Supp. 3d 689, 714 (D. Md. 2014).  As was the case with the defamation claim, "the discovery rule generally applies to a cause of action brought under § 5-101," such that "'the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.'"  *Walton v. Wells Fargo Bank, N.A.,* No. AW-13-428, 2013 WL 3177888, at *6 (D. Md. June 21, 2013) (quoting *Poffenberger v. Risser,* 431 A.2d 677, 680 (Md. 1981)).  Further, each misrepresentation by a defendant is a new violation of the MCPA and MCDCA for the purpose of the statute of limitations analysis.[37]

As an initial matter, the Court must determine whether the alleged violations in Count I relate back to the original complaint.  It is undisputed that the Plaintiffs' MCPA allegations that Ocwen demanded sums when the Plaintiffs were

---

[37] *Compare Walton v. Network Solutions*, 110 A.3d 756, 767-69 (Md. Ct. Spec. App. 2015) (barring the plaintiff's MCPA claims under the statute of limitations because there was only one misrepresentation by the defendant although there was "continuing harm," because "appellant unconvincingly argues that the continuing harm doctrine is applicable" to MCPA actions), *with Fontell*, 891 F. Supp. 2d at 741 (noting that the plaintiff would be permitted to "seek[] damages based on [the] Defendants' actions that occurred after June 6, 2007" because any action or misrepresentation made before that date was barred by the statute of limitations).

not in default and claimed improper fees relate back to the original complaint.  The Plaintiffs only supplemented these claims by alleging damages as required by the Court's prior order.  Because the original complaint was filed on June 3, 2013, any violations that accrued before June 3, 2010 are barred by the statute of limitations.  Because Owen began servicing the Ayers Note on November 1, 2011,[38] any alleged misrepresentations by it are within the statute of limitations.[39]

The Plaintiffs also allege that Ocwen violated the MCPA and MCDCA by asserting the Mrs. Ayres was obligated under the note.  Am. Compl. ¶¶ 85-86, 92.  Unlike the other MCPA allegations, these alleged violations do not relate back to the original complaint for reasons explained previously.[40]  Therefore, any misrepresentations that Mrs. Ayres was obligated under the Ayres Note that accrued before October 24, 2011 are barred by the statute of limitations.  In the amended complaint, the only relevant allegation in dispute is Litton's allegedly false

---

[38] Am. Compl. at ¶ 53.

[39] The Plaintiffs recognize that the misrepresentations by Litton in the amended complaint are time barred and assert that these misrepresentations were only "offered as background for the subsequent statements and collection efforts undertaken by Ocwen . . . well within the limitations period . . . ."  ECF No. 69 at 28.  Accordingly, the Plaintiffs may not recover damages for Litton's alleged violations made before June 3, 2010.

[40] *See supra* Part II.B.3.c.

reports to credit reporting agencies.  *See* Am. Compl. at ¶¶ 47-
53 (detailing the period between January 2010 and November
2011).  The Plaintiffs do not, however, provide a date when
these statements were made, to which agencies, or how the Ayres
learned of the reports.  *See* Am. Compl. at ¶ 51.  Although the
Court cannot determine as a matter of law that the allegation is
barred by the statute of limitations because of this lack of
detail, this allegation fails to satisfy Rule 9(b)'s pleading
requirements.[41]  Therefore, the Plaintiffs will not be able to
recover damages based on this violation.

Accordingly, the Plaintiffs may not recover damages for any
MCPA violation regarding Ocwen's demanding sums when the
Plaintiffs were not in default and claiming improper fees that
occurred prior to June 3, 2010, or for any MCPA and MCDCA
violations related to Mrs. Ayres obligor status that occurred
prior to October 24, 2011.

5. Count II: MFPA Violations

The Maryland Mortgage Fraud Protection Act states that "[a]
person may not commit mortgage fraud."  Md. Code Ann., Real

---

[41] To satisfy Rule 9(b), a plaintiff must "identify with some
precision the date, place, and time of active misrepresentations
or the circumstances of active concealments, specifying which
Defendant . . . is supposedly responsible for those statements
or omissions."  *Johnson,* 492 F. Supp. 2d at 509.

Prop. § 7-402. Mortgage fraud "means any action by a person made with the intent to defraud" that involves actions such as:

> (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; (2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

Md. Code Ann., Real Prop. § 7-406(d). The statute defines "mortgage lending process" to include "[t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage." Md. Code Ann., Real Prop. § 7-401(e)(2). The MFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle." Md. Code Ann., Real Prop. § 7-406(a)(1).

To state a claim for fraudulent misrepresentation, a plaintiff must allege:

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 520 (D. Md. 2013). Because the Plaintiffs' MFPA claims sound under fraud, the heightened pleading standard of Rule 9(b) applies. *See Zervos v. Ocwen Loan Serving, LLC*, No. 1:11-CV-03757-JKB, 2012 WL 1107689, at *5 (D. Md. March 29, 2012).

In the original complaint, the Plaintiffs alleged that Ocwen violated the MFPA by "creating a fraudulent transaction history and composite report, misrepresenting the account balance, fraudulently charging servicer advances, late fees, property preservation and inspection fees, and interest, and failing to include disclosures." ECF No. 55 at 19. The Court dismissed the claims because the Plaintiffs "[c]ollectively referr[ed] to the Defendants rather than identifying the party that made the alleged misrepresentation," "fail[ed] to allege that they relied on the misrepresentations," and did not allege that "the Defendants made the representations with intent to defraud as required by the MFPA." *Id.* at 20. Ocwen argues that the amended complaint has not corrected there errors. *See* ECF No. 66 at 13.

Throughout the amended complaint, the Plaintiffs continually state that Litton and Ocwen made statements on which they intended the Plaintiffs to rely. *See, e.g.*, Am. Compl. at

¶¶ 3, 18, 26, 40.  However, the Plaintiffs never allege that they actually relied on the misrepresentations or suffered damages based on that reliance.[42]  *See* Md. Code Ann., Real Prop. § 7-401(d)(1), (2).  Accordingly, the Plaintiffs have failed to cure the defect identified by the Court in its prior opinion, and the MFPA claim will be dismissed.

> 6. Count III: Negligence

To state a claim for negligence under Maryland law, a plaintiff must allege that (1) the defendant had a duty to the plaintiff, (2) the defendant breached the duty, (3) the plaintiff suffered actual loss, and (4) the loss was proximately caused by the breach.  *See Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 188 (Md. 1994).

The Court dismissed the negligence claim in the original complaint because "the Plaintiffs d[id] not allege any specific duty owed by the Defendants."  ECF No. 55 at 14.  The Court recognized that "[c]ourts have consistently found that a mortgage servicer does not owe a tort duty to its loan customer."  *Id.* (citing *Farasat v. Wells Fargo, Bank, N.A.*, 913

---

[42] The Plaintiffs only state that "[a]s a result of Ocwen's knowingly deceptive and untrue communications and misstatements and omissions . . ., [the] Plaintiffs have suffered economic and noneconomic damage."  ECF No. 103.  They do not state whether those damages flowed directly from their reliance on the misrepresentations or directly from Ocwen's actions without any reliance on the part of the Plaintiffs.

F. Supp. 2d 197, 207-08 (D. Md. 2012); *Bowers v. Bank of America, N.A.*, 905 F. Supp. 2d 697, 703 (D. Md. 2012)).

In the amended complaint, the Plaintiffs attempt to revive their negligence claim by asserting that Ocwen owed them by a regulatory duty of good faith and fair dealing, a duty as "real estate professionals," and a duty because of the "intimate nexus" between the parties.  Am. Compl. at ¶¶ 15-17.

In asserting that there is an "intimate nexus" between the parties, the Plaintiffs cite *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756 (1986).  *See* Am. Compl. at ¶ 15.  In *Jacques*, a case involving an unusually structured bank loan application, the Maryland Court of Appeals held that a contract may give rise to a bank's tort duty to a loan applicant.  *See Jacques*, 515 A.2d at 762.  However, the *Jacques* court recognized that a negligent breach of contract without an independent obligation, "is not enough to sustain an action sounding in tort." *Id*. at 759 (*quoting Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961)).  Courts have consistently held that *Jacques* is a very narrow exception.  *See, e.g.*, *Spaulding*, 920 F. Supp. 2d at 621 ("The United States Court of Appeals for the Fourth Circuit has interpreted this exception to apply only to vulnerable parties.") (citing *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 293-94 (4th Cir.2002)).

Here, although the Plaintiffs have asserted there is contractual privity between Ocwen and Mr. Ayres through the Ayres Note,[43] the Plaintiffs have failed to allege sufficient special circumstances creating a fidicary relationship under *Jacques*. *See Allen*, 2011 WL 3425665, at *8.

In support of their assertion that Ocwen owed a duty as a "real estate professional," the Plaintiffs cite *Hoffman v. Stamper*, 867 A.2d 276 (Md. 2005). Am. Compl. at ¶ 17. In *Hoffman*, however, the Court was only analyzing whether there was sufficient evidence to support a jury verdict for conspiracy, fraud, and violation of the MCPA. *Id*. at 280. The *Hoffman* court never analyzed the plaintiffs' negligence claims because the jury did not return a liable verdict on that count; nor did the court create a new duty of care for real estate professionals. *See id*. Further, if there were such a duty on all real estate professionals, it would effectively negate the well-established rule that a mortgage servicer does not owe a tort duty to its loan customer. *See Farasat*, 913 F. Supp. 2d at 207-08; *Bowers*, 905 F. Supp. 2d at 703.

---

[43] The mortgage Deed of Trust does not create sufficient contractual privity to support a fiduciary relationship; a separate contract is required. *See Green*, 927 F. Supp. 2d at 252-53; *Spaulding*, 920 F. Supp. 2d at 621.

Finally, the Plaintiffs allege that Ocwen owed them a regulatory duty under Md. Code Regs. 09.03.06.20. Am. Compl. at ¶ 16. The regulation cited by the Plaintiffs was promulgated by the Maryland Commissioner of Financial Regulation and states:

> Good Faith and Fair Dealing. A licensee has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan, including, but not limited to . . .
>
> 3.   The duty when servicing mortgage loans to:
>
>      a.   Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting;
>
>      b.   Make borrowers in default aware of loss mitigation options and services offered by the licensee;
>
>      c.   Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and
>
>      d.   Pursue loss mitigation when possible.[44]

Under Maryland law, "the breach of a statutory duty may be considered some evidence of negligence." *Pahanish v. W. Trails, Inc.*, 517 A.2d 1122, 1132 (Md. 1986). This standard has also been applied to regulations. *See Paul v. Blackburn Ltd. Partnership*, 63 A.3d 1107 (Md. Ct. Spec. App. 2013). "Before

---

[44] Md. Code Regs. 09.03.06.20, *available at* http://www.dsd.state.md.us/comar/comarhtml/09/09.03.06.20.htm (last visited Aug. 12, 2015).

that breach of statutory duty can be used in that manner, however, three requirements must be met." *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 430 (D. Md. 2014).

> First, the plaintiff must be a member of the class of persons the statute was designed to protect. Second, the injury suffered must be of the type the statute was designed to prevent. Third, the plaintiff must present legally sufficient evidence to demonstrate that the statutory violation was the proximate cause of the injury sustained.

*Pahanish*, 517 A.2d at 1132 (citations omitted).

The Court need not decide if the regulation in this instance fulfills the first element of the test[45] because it fails the second element. Notably, the Plaintiffs only assert their negligence claim "as an alternative claim to Counts I, II, and V." Am. Compl. at 34.  Those claims are the Plaintiffs allegations alleging violations of the MCPA, the MCDCA, and the MFPA, as well as tortious interference with business relationships.  These claims relate to Ocwen's alleged misrepresentations and claiming fees even though the Plaintiffs were not in default.  The regulation, however, does not address such claims, it solely addresses a servicer's ability to promptly provide information to the borrower.  Nowhere in Counts

---

[45] "The requirement that the 'injury suffered must be of the type the statute was designed to prevent' has generally limited the application of this principle to the violation of statutes related to public safety or health related issues . . . ." *Estate of Saylor*, 54 F. Supp. 3d at 430-31 (listing cases).

I, II, and V do the Plaintiffs allege that Ocwen violated any of the provisions in the regulation.

At most, the regulation could be said to cover Ocwen's failure to respond to the Plaintiffs QWRs as alleged in their RESPA claim.  However, the Plaintiffs do not claim these actions as a basis for negligence (the RESPA violation was Count IV), and, even if they did, the Plaintiffs have failed to plead legally sufficient allegations "to demonstrate that the statutory violation was the proximate cause of the injury sustained."[46]  As discussed under the RESPA claim, the Plaintiffs do not identify how their damages flowed directly from Ocwen's failure to respond to the QWRs.  *See supra* Part II.B.3.a.

Accordingly, the Plaintiffs' negligence claim will be dismissed.

### 7. Count VI: Declaratory and Injunctive Relief

Because a number of the Plaintiffs' claims remain, the Court will deny Ocwen's motion to dismiss this count.

### 8. Count VIII: FDCPA Violations

By enacting the FDCPA, Congress sought to "eliminate abusive debt collection practices by debt collectors."  15 U.S.C. § 1692(e).  The FDCPA applies when a debt collector uses practices prohibited by the statute.  *Bradshaw v. Hilco*

---

[46] *Pahanish*, 517 A.2d at 1132.

*Receivables, LLC*, 765 F. Supp. 2d 719, 725 (D. Md. 2011).   The
FDCPA contains non-exhaustive lists of prohibited practices.
*See, e.g.*, 15 U.S.C. § 1692f.   "The FDCPA is a strict liability
statute and a consumer has only to prove one violation in order
to trigger liability."   *Bradshaw*, 765 F. Supp. 2d at 725 (*citing*
§ 1692k(a)).

     To state a claim under the FDCPA, the plaintiff must allege
that:   (1) the defendant is a debt collector under the FDCPA,
(2) the plaintiff is the object of a collection activity arising
from consumer debt, and (3) the defendant engaged in a debt
collection activity prohibited by the FDCPA.   *See Ademiluyi v.
PennyMac Mortg. Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502,
524 (D. Md. 2013); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759
(D. Md. 2012).

     A "debt collector" is "any person who uses any
instrumentality of interstate commerce . . . in any business the
principal purpose of which is the collection of any debts, or
who regularly collects or attempts to collect, directly or
indirectly, debts owed or due or asserted to be owed or due
another."   *Id.* § 1692a(6).   Generally, mortgage servicing
companies are not debt collectors under the FDCPA.   *See, e.g.*,
*Adam v. Wells Fargo Bank, N.A.*, No. ELH-09-2387, 2011 WL
3841547, at *20 (D. Md. Aug. 26, 2011); *Flores v. Deutsche Bank*

*Nat'l Trust, Co.,* No. DKC-10-0217, 2010 WL 2719849, at *6 (D. Md. July 7, 2010).

Mortgage servicing companies are exempt from the definition of "debt collectors" under the FDCPA only "to the extent that they take action to collect debts that were not in default at the time they acquired the debts."[47]  "[The] exception, which may operate to remove a loan servicer from the definition of a 'debt collector', does not apply if the loan was in default at the time it was acquired by the servicing company, *or if the servicing company treated it as such." Shugart v. Ocwen Loan Servicing, LLC,* 747 F.Supp.2d 938, 942-43 (S.D. Ohio 2010) (emphasis added).[48]

In this case, although the Plaintiffs allege that they were not actually in default at the time Ocwen began servicing the Ayres Note, they do allege that "Ocwen acquired the Ayres Note at a time when it believed the associated account was in default . . . and has attempted and actually collected on the Ayres Note

---

[47] *See Webb v. Green Tree Servs., LLC*, No. ELH-11-2105, 2012 WL 2065539, at *3 (D. Md. June 7, 2012); 15 U.S.C. § 1692a(6)(F)(iii) (exempting from the definition of the term "debt collector" any person attempting to collect a debt owed to the extent it "concerns a debt which was not in default at the time it was obtained by such person.").

[48] *See also Allen v. Bank of Amer. Corp.*, 2011 WL 3654451, at *7 n.9 (D. Md. Aug. 18, 2011) ("Where a servicer believes a loan to be in default at the time it commences servicing, however, courts have found it is not exempt from the FDCPA's definition of 'debt collector.") (citations omitted).

. . . ." Am. Compl. at ¶ 140.  On December 6, 2011, just one month after Ocwen began servicing the account, it notified the Plaintiffs that payments were past due and the account was in default.  *Id*. at ¶ 53.  These allegations are sufficient to plead that Ocwen is a debt collector under the FDCPA.[49]

Accordingly, the Court will deny Ocwen's motion to dismiss the FDCPA claim.

C.   Mrs. Ayres Motion for Summary Judgment

1. Facts Outside the Amended Complaint[50]

Although the parties discuss the facts of this case in depth in their filings, in many instances detailing what is in the amended complaint, the only facts relevant to this motion for summary judgment relate to a Forbearance Agreement between the Plaintiffs and HUD.  *See* ECF No. 66-1.

---

[49] *See Galante*, 2014 WL 3616354, at *30 ("In my view, defendant's central argument in support of dismissal—that because plaintiffs have alleged that they were not, in fact, in default, they effectively conceded that Ocwen is not a debt collector—is too clever by a half.  It is noteworthy that, approximately two weeks after acquiring its interest in the mortgage, Ocwen allegedly sent plaintiffs a Notice of Intent to Foreclose. Here, . . . the servicer's alleged treatment of the loan as being in default at the time of the acquisition of its interest is sufficient to qualify Ocwen as a 'debt collector.'").

[50] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

It is undisputed that when Mr. Ayres signed the Ayres Note, he was not married to Mrs. Ayres, and Mrs. Ayres does not appear on the Ayres Note as a borrower. *See, e.g.*, ECF No. 70-2; ECF No. 70-3. After the Plaintiffs married, they used the Property as their family home and "Mrs. Ayres [] was given authority by Mr. Ayres to communicate with various mortgage servicers about the status of the loan from time to time on his behalf." ECF No. 70-1 at 2.

On April 28, 2000, the Plaintiffs signed a Forbearance Plan with HUD. *See* ECF No. 66-1. The Forbearance Plan listed both Plaintiffs as "Mortgagors," and stated that "[i]n return for [HUD] not foreclosing on my mortgage which is still in default under the original note, I agree to the following terms and conditions . . . ." *Id.* Under "Monthly Payments," the Forbearance Agreement stated:

> Beginning on 05-01-2000, and continuing through 04-30-2001, on the first day of each month I will submit to HUD a check or money order in the amount of $750.00. I also understand that this Payment plan will be reviewed on 02-28-2001, *and a determination made as to whether or not it should be amended or continued in force*, . . . .

*Id.* (emphasis added). The final section of the Forbearance Plan, titled "Original Note and Mortgage" states:

> I understand that all rights and obligations of the original note and mortgage, except as changed by this Payment Plan/Forbearance Plan, remain in full force and that, when this Payment Plan/Forbearance Plan

expires, the monthly mortgage payments due under the
note and mortgage will begin again, unless HUD agrees
to renew, amend or extend the Payment Plan/Forbearance
Plan.

*Id.*

Each plaintiff signed the Forbearance Plan, and under each
name is the title "Mortgagor." ECF No. 66-1. In an affidavit,
Mrs. Ayres states that she "[n]ever obligate[d] [her]self" for a
mortgage loan, and, when she signed the Forbearance Plan, she
thought that she was only agreeing "to help make sure [Mr.
Ayres] made payments required by that agreement through February
28, 2001." ECF No. 70-4 at 3. In contrast, Ocwen cites a
variety of documents and communications which were attached to
the original complaint in which Mrs. Ayres represented that she
was a mortgagor under the Forbearance Plan or acted as if she
was a borrower.[51] *See* ECF No. 74 at 4-6, 8.

_____

[51] Mrs. Ayres asserts that the Court cannot consider the evidence
cited by Ocwen because it was attached to the original
complaint. ECF No. 81 at 3-4. An amended complaint supersedes
an original complaint. *Pac. Bell Tel. Co.*, 555 U.S. at 456.
Accordingly, a court may not consider evidence attached to the
original complaint on a motion to dismiss the amended complaint
because the documents are outside the pleadings. However, Mrs.
Ayres cites no case holding that evidence provided by a
plaintiff on an original complaint containing the plaintiff's
statements, cannot be used against the plaintiff on a motion for
summary judgment initiated before discovery. Simply because the
original complaint was superseded does not make the documents
"immaterial" as Mrs. Ayres alleges. *See* ECF No. 81 at 3.

2. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[52]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [her] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

[52] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment."  Fed. R. Civ. P. 56 advisory committee's note.

3. The Forbearance Plan

"Maryland adheres to the principle of the objective interpretation of contracts."[53]  *Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007).  "If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation."[54]  *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.*, 952 A.2d 275, 283 (Md. 2008).  "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'"  *Calomiris v. Woods*, 727 A.2d 358, 368 (Md. 1999) (quoting *Canaras v. Lift Truck Services*, 322 A.2d 866, 873 (Md. 1974)).

Courts must consider contracts "from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation."  *Ocean Petroleum Co. v. Yanek*, 5 A.3d

---

[53] "Maryland uses the lex *loci contractus* rule: 'the law of the jurisdiction where the contract was made controls its validity and construction.'"  *Rose v. New Day Fin.*, 816 F. Supp. 2d 245, 253 (D. Md. 2011) (quoting *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466, 467 (1988)).  The parties agree that the contracts at issue were made in Maryland, and Maryland law applies.

[54] "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law."  *Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008).

683, 690 (Md. 2010); *see also Cochran v. Norkunas,* 919 A.2d 700, 709 (Md. 2007) ("[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.") (quotation omitted). "The language of a contract is only ambiguous if, when viewed from this reasonable person perspective, that language is susceptible to more than one meaning." *Ocean Petroleum Co.,* 5 A.3d at 690-91.

"[P]arties to a written contract are usually free to modify or terminate . . . contract[s] by separate agreement . . . ." *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.,* 884 A.2d 112, 129 (Md. 2005). However, as is the case with the terms of the original contract, the modifications must be consistent with the law. *See Mortgage Investors of Wash. v. Citizens Bank and Trust Co. of Md.,* 366 A.2d 47, 49 (Md 1976)(recognizing "the rights of parties to make . . . contracts as they please, so long as they are consistent with law").

As an initial matter, Mrs. Ayres argues that the Forbearance Agreement cannot act as a modification of the Ayres Note because it violates the Statute of Frauds. ECF No. 70-1 at 8-9. However, the Forbearance Agreement is in writing and signed by Mrs. Ayres, so the requirements of the Statute of

Frauds are met.[55]   *See* Md. Code Ann., Cts. & Jud. Proc. § 5-901.

Accordingly, the Court will look to the Forbearance Agreement's

express terms to determine if Mrs. Ayres was a borrower.

A reasonable person standing in the parties' shoes at the

time of the Forbearance Agreement's formation,[56] would conclude

that Mrs. Ayres was agreeing to obligate herself under the terms

of the Forbearance Plan and that the Forbearance Plan was

intended to modify the original loan at least in terms of

payment.  First, the Plan states that it is a modification of

the original loan.  *See* ECF No. 66-1 ("I understand that all

rights and obligations of the original note and mortgage, *except*

*as changed by this Payment Plan/Forbearance Plan . . . .*")

(Id.).  From the plain language of the Forbearance Plan, it is

clear that it intended to alter the payments on the original

loan, and that the signees were agreeing to make payments of

$750.00 a month beginning on May 1, 2000.  Although Mrs. Ayres

---

[55] Similarly, Mrs. Ayres argues that the Forbearance Agreement
cannot make her a borrower because it violates Md. Code Ann.,
Com. Law § 3-401(a).  ECF No. 81 at 4.  Section 3-401 states
that "[a] person is not liable on an instrument unless (i) the
person signed the instrument, or (ii) the person is represented
by an agent or representative who signed the instrument and the
signature is binding on the represented person under § 3-402."
Here, although Mrs. Ayres did not sign the Ayres Note, she did
sign the Forbearance Agreement, so she may be liable under that
agreement.

[56] *Ocean Petroleum Co.*, 5 A.3d at 690.

asserts that this was not her intention in signing the
Forbearance Agreement, the Court cannot look beyond the four
corners of the agreement unless its terms are ambiguous.  There
is no limiting language in the agreement reflecting Mrs. Ayres's
belief that she was not agreeing to be liable for the payments,
but only "helping" Mr. Ayres.  Therefore, based on the language
of the Forbearance Plan, Mrs. Ayres was liable under the Plan if
she failed to make payments for the period between May 1, 2000
and March 30, 2001.

The Forbearance Plan, however, is ambiguous regarding
whether the Forbearance Plan (and Mrs. Ayres's liability)
extended beyond March 30, 2001.  *See* ECF No. 66-1 ("[T]his
Payment plan will be reviewed on 02-28-2001, *and a determination
made as to whether or not it should be amended or continued in
force*, . . . .") (emphasis added).  The Plan is also ambiguous
regarding whether it was intended to permanently modify the
original Ayres Note and add Mrs. Ayres as a borrower.  Although
Mrs. Ayres was listed on the Forbearance Plan as a "Mortgagor"
and signed the document as a "Mortgagor," there are no express
terms within the Plan addressing her status.  These facts can be
interpreted as either (1) an attempt to modify the original
Ayres Note and add Mrs. Ayres as a mortgagor because of her
marriage to Mrs. Ayres or (2) a clerical error by HUD which

resulted in Mrs. Ayres being listed as a "mortgagor" on the top
of the Forbearance Plan, but was never intended to alter the
original Note beyond the new payments.

Because the contract is ambiguous, the Court may "consider
any extrinsic evidence which sheds light on the intentions of
the parties at the time of the execution of the contract."
*Cnty. Comm'rs v. St. Charles*, 784 A.2d 545, 556 (Md. 2001).
Although both parties have cited evidence supporting their
interpretation of the contract, the record is incomplete because
discovery has yet to commence.[57]   Whether Mrs. Ayres was a
"borrower" is a central issue in this case, and "as a general
rule, summary judgment is appropriate only after 'adequate time
for discovery.'"[58]   Accordingly, the Court will deny the summary

---

[57] Although Ocwen did not attach a Rule 56(f) affidavit
requesting discovery to its response in opposition, it did move
separately for discovery on whether Mrs. Ayres obligated herself
under the Forbearance Plan.   ECF No. 86.   "When the nonmoving
party, through no fault of its own, has had little or no
opportunity to conduct discovery, and when fact-intensive
issues, such as intent, are involved, courts have not always
insisted on a Rule 56(f) affidavit if the nonmoving party has
adequately informed the district court that the motion is pre-
mature and that more discovery is necessary."   *Harrods Ltd. v.
Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir.
2002) (determining that a "nonmoving party's objections before
the district court [may] 'serve[] as the functional equivalent
of an affidavit'" (quoting *First Chicago Int'l v. United
Exchange Co.,* 836 F.2d 1375, 1380-81 (D.C. Cir. 1988)).

[58] *Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954 (4th
Cir. 1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322,
(1986)).

judgment motion; the parties may raise this issue after sufficient discovery has occurred.[59]

III. Conclusion

For the reasons stated above, Salomon Brothers's motion will be granted, Ocwen's motion to dismiss will be granted in part and denied in part, Mrs. Ayres's motion will be denied, and Ocwen's motion for limited discovery will be denied as moot.

_9/8/15_
Date

_William D. Quarles, Jr._
William D. Quarles, Jr.
United States District Judge

---

[59] Because the Court is denying the motion for summary judgment, Ocwen's motion for limited discovery will be denied as moot.

63